**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PHINA KWENTOH, | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 3:05 CV 79 (CFD) |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT | : | |
| DEPARTMENT OF CHILDREN | : | |
| AND FAMILIES JUVENILE TRAINING | : | |
| SCHOOL and PATRICIA COLONGHI | : | |
| Defendants. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Phina Kwentoh ("Kwentoh") brought this action against the Connecticut Department of

Children and Families Juvenile Training School ("CJTS") and Patricia Colonghi ("Colonghi")

for violations of her First and Fourteenth Amendment rights and her rights under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Kwentoh's claims arise out of

alleged illegal discrimination and retaliation she claims she suffered during her employment at

CJTS and from her termination from that position. The defendants moved for summary

judgment.

## I.    Background[1]

Kwentoh describes herself as "a dark skinned native of Nigeria." She was originally

trained as a nurse in Nigeria in 1983. After emigrating to the United States, from 1991 to 1999

she worked as a nurse and as a nurse supervisor in several medical facilities in Connecticut,

including a group home operated by the Connecticut State Department of Mental Retardation. In

---

[1]The facts are taken from the parties' Local Rule 56(a) statements, summary judgment
briefs, and other evidence submitted by the parties. They are undisputed unless otherwise
indicated.

1

1999, Kwentoh received a Bachelors of Science in Nursing from Southern Connecticut State University. Also in 1999, the Connecticut Department of Children and Families ("DCF") hired Kwentoh as a Nursing Supervisor, initially at Long Lane School ("LLS") and later at CJTS,[2] where she remained until her termination on October 15, 2003.[3] Kwentoh received a four page job description for her position when she was hired. Her responsibilities included supervising the nursing personnel at her facility, orienting and training new nurses, serving as a resource person for the facility's medical department, maintaining the nurses' schedules, including ensuring sufficient nursing coverage at the facility and scheduling nurses' vacations and overtime work, and certain duties relating to medication control and supervision. She was also required to assist with direct patient care when necessary.

As a Nursing Supervisor, Kwentoh reported to the Director of Nursing, a position occupied by defendant Colonghi from June 2001 until October 3, 2003. Kwentoh's allegations stem from her contentious relationship with Colonghi.

**A.    Areas of Conflict between Colonghi and Kwentoh**

    1.    Scheduling

Four primary areas of conflict developed between Kwentoh and Colonghi. First, Kwentoh and Colonghi frequently butted heads over Kwentoh's preparation of her subordinate

---

[2]DCF describes CJTS as a "secure treatment facility for boys ages 12-17 who are committed delinquent." DCF: Welcome to the Bureau of Juvenile Services at http://www.ct.gov/dcf/cwp/view.asp?a=2550&q=314444#CJTS (last visited October 28, 2008). LLS was a similar facility.

[3]During the period of Kwentoh's employment, DCF closed LLS and moved its residents to CJTS. The transition period started in August of 2001 and lasted until the end of February 2003.

nurses' schedules.  Colonghi claims that Kwentoh did not perform her scheduling duties in accordance with the union contract.  She also claims that Kwentoh improperly disregarded nurses' requests for time off in accordance with the union contract, left voids in the schedule, failed to properly post vacation periods, improperly assigned overtime and holiday shifts, and failed to give nurses sufficient notice of changes to the schedule.  Several of Kwentoh's subordinate nurses submitted written complaints to Colonghi about Kwentoh's scheduling. Kwentoh concedes that she was primarily responsible for the nurses' scheduling, but she asserts that Colonghi undermined Kwentoh's supervisory authority in this area by regularly intervening in the scheduling without consulting with Kwentoh, and that scheduling presented inherent difficulties for other reasons not originating with Kwentoh, such as a lack of nursing resources. She asserts that the scheduling difficulties continued unabated after she was relieved of responsibility for scheduling and that the complaints against her were obtained by Colonghi in an attempt to "paper the record" in preparation for Kwentoh's termination.

> 2.     Kwentoh's Supervisory Abilities

Second, Colonghi frequently criticized Kwentoh's supervisory skills and judgment. Colonghi felt Kwentoh did not understand the proper scope of her supervisory responsibilities and that despite verbal and written communications regarding Kwentoh's job description in 2001 and 2002, Kwentoh's performance did not improve.   Kwentoh denies that she did not understand what was expected of her, although she also indicates that if she did not understand, it was because Colonghi "regularly changed instructions and created confusion regarding what she expected."

In addition, Colonghi questioned Kwentoh's supervisory judgment regarding her

interactions with her subordinates, for example because Kwentoh spoke to employees about private issues in public places, questioned several employees about scheduling and attendance issues by calling them at home, and spoke to nurses in a harsh and disrespectful tone. Kwentoh claims that Colonghi counseled Kwentoh in the presence of other employees on many occasions, and that Colonghi spoke to her in a harsh, disrespectful and harassing manner on many occasions. Kwentoh also claims that Colonghi spoke of Kwentoh negatively to Kwentoh's subordinates.

Colonghi also criticized Kwentoh's judgment in allowing her subordinates to erase a medical alert board, used for important medical information, in order to post a duplicate version of the vacation schedule, and for issuing an evaluation of a nurse with whom she had not met regularly. Finally, Colonghi criticized Kwentoh for taking over five months to only partially complete her assignment of creating a department committee to work on a procedure to monitor "sharps" (needles, razors, etc). Kwentoh admits that some of these incidents occurred, but denies that she had poor supervisory skills and contends Colonghi documented these incidents in order to create a paper trail to justify her termination.

### 3.    Kwentoh's Direct Patient Care Skills

Third, Colonghi criticized Kwentoh's judgment regarding patient care and her clinical skills. For example, in June 2003 Colonghi issued a reprimand for Kwentoh's role in an admission of a youth withdrawing from heroin because Kwentoh failed to inform the pediatrician of drug withdrawal symptoms and to put in place any monitoring of vital signs. Following this incident, Colonghi filed a formal complaint with the nursing board. Kwentoh responds that drug withdrawal symptoms were not present during her exam of the youth, that the social worker who

handled initial "intake" of the youth noted that it was not necessary to place the youth on administrative watch (in which the youth would have been checked every ten minutes for any problem or change in condition), that Kwentoh's actions were in keeping with CJTS procedures, and that other Caucasian nurses who committed more serious drug-related errors received only counseling rather than being reprimanded and brought before the nursing board.

Colonghi complained of several other poor nursing practices by Kwentoh. Kwentoh disputes the accuracy of Colonghi's description of these incidents and asserts that the complaints against Kwentoh are part of a "paper trail" created for the purpose of justifying Kwentoh's termination. Kwentoh claims that other nurses made similar or more serious errors and were not reprimanded.

### 4. Kwentoh's Use of Overtime

Finally, Colonghi criticized Kwentoh's use of overtime to complete supervisory or other duties, when overtime was only to be used for direct patient care. Kwentoh claims that unauthorized use of overtime that was included in her 2002 performance evaluation was again included in her 2003 evaluation despite there being no further instances of unauthorized overtime use. Kwentoh also claims that she worked late without pay to complete her duties as a result of the "supervisory overload" that was placed on her.

### B. Other Nurse Supervisors

Colonghi appointed Linda Unkelbach, a white female, to a temporary position of service in a higher class as Nurse Supervisor at Long Lane School on October 1, 2002. Unkelbach was to take on some of Kwentoh's supervisory duties as well as continue in her previous direct care role. At this time, Colonghi also took on direct supervisory responsibilities over the nurses on

the first shift. Colonghi had no complaints regarding Unkelbach's performance. In May 2003, Maurice Cooper, a black male, was hired as an additional Nurse Supervisor and began to share duties equally with Kwentoh.

### C.  Actions Taken Due to Areas of Conflict

Colonghi issued two performance appraisals for Kwentoh in which Kwentoh received an overall performance rating of unsatisfactory due to the foregoing areas of concern. The first related to the period from September 1, 2001 to August 31, 2002, and the second related to the period from September 1, 2002, to August 31, 2003. Colonghi and Kwentoh met to discuss both performance appraisals. After the two unsatisfactory appraisals, Colonghi, who did not have authority to terminate Kwentoh, met with the CJTS superintendent and representatives from human resources. They considered a demotion to a patient care position in lieu of dismissal, but determined this to be inappropriate due to the direct care concerns. In accordance with Connecticut administrative regulations, which provide that an employer may terminate an employee who has received two consecutive unsatisfactory performance appraisals, Kwentoh was terminated effective October 15, 2003.

Kwentoh contends that Colonghi was looking for a reason to fire her from the day Colonghi was hired, and that the emails, meetings, and documentation were a deliberate attempt to make her work environment hostile for the purpose of getting rid of her "in any possible manner" and to "paper the file" so as to conceal the discriminatory reason for firing Kwentoh. Kwentoh filed a CHRO complaint on January 22, 2003. Colonghi denies deliberately creating a paper trail, and also denies that she discriminated against Kwentoh because of her race, color, or national origin, or retaliated against her for having filed a CHRO complaint.

6

The complaint in this case was filed on January 13, 2005. The complaint alleges that

Colonghi subjected Kwentoh to a hostile work environment, disparate treatment discrimination,

and retaliation in violation of Title VII, the Equal Protection Clause of the Fourteenth

Amendment, and the First Amendment.

## II.    Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. 56;  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White

v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000).   The burden of showing that no

genuine factual dispute exists rests upon the moving party.  Carlton v. Mystic Transp., Inc., 202

F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d

1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the

motion the nonmoving party must "set forth specific facts showing that there is a genuine issue

for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in

his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences

in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255;

Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no

rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134.

Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a

reasonable jury could credit it.  Evidence favorable to the moving party, on the other hand, must

be disregarded unless a reasonable jury would have to credit it because it comes from a

disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III. Discussion

Kwentoh has filed a three-count Complaint in which she alleges that the defendants (1) violated Title VII, (2) violated 42 U.S.C. § 1981,[4] and (3) deprived her of equal protection of the law on the basis of her race and in retaliation for her exercise of First Amendment rights.

### A. Title VII

In an employment discrimination case, the plaintiff has the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. Carlton, 202 F.3d at 134 (internal citations omitted). "A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004), (citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)). Under either theory, liability in a disparate-treatment case "depends on whether the protected trait ... actually motivated the employer's decision." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003).

"Direct evidence of discrimination is not necessary, because proof is seldom available

_____

[4]This count has been dismissed. [Dkt. # 27].

with respect to an employer's mental processes.  Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file.  Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial.  Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact."  <u>Carlton</u>, 202 F.3d at 135 (internal citations omitted).

### 1.     Adverse Job Action Claim

_____To establish a prima facie discriminatory treatment case based on an adverse job action a plaintiff must show "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Feingold v. New York</u>, 366 F.3d at 152 (citing <u>Collins v. New York City Transit Auth.</u>, 305 F.3d 113, 118 (2d Cir. 2002)).

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" <u>Id.</u> (quoting <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." <u>Feingold v. New York</u>, 366

F.3d at 152 (internal quotation marks and alterations omitted).

A plaintiff may raise an inference of discriminatory intent by showing that the employer treated her less favorably than a similarly situated employee outside her protected group. <u>Lee v. Connecticut</u>, 427 F.Supp.2d 124, 131 (D. Conn. 2006) (citing <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir.2000)). To be similarly situated the individuals with whom the plaintiff attempts to compare herself must be similarly situated "in all material respects." <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir.1997) (citing <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir.1992)). "What constitutes 'all material respects' ... must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical." <u>Graham</u>, 230 F.3d at 40 (internal citations omitted).

These requirements of the prima facie case can vary depending on the context and were "never intended to be rigid, mechanized, or ritualistic." <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 512 (2002) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978); citing also <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 n.13 (1973) ("[T]he specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations"); <u>Teamsters v. United States</u>, 431 U.S. 324, 358 (1977) (noting that this Court "did not purport to create an inflexible formulation" for a prima facie case)). Moreover, "[t]he burden of establishing a prima facie case is not a heavy one. One might

characterize it as minimal." Carlton, 202 F.3d at 134. Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises; the employer must then articulate a legitimate reason for the adverse employment action. See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "The purpose of this step is 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.'" Carlton, 202 F.3d at 134 (citing Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)). After a defendant provides a legitimate reason for its actions, the plaintiff must show that the proffered reason is pretextual, and that the real reason for the discharge was discrimination. See Graham, 230 F.3d at 38. In other words, the plaintiff must offer proof "through presentation of his own case and through cross-examination" that would allow a rational factfinder to conclude that the proffered reason was not the true reason for the adverse employment action. Carlton, 202 F.3d at 135 (internal citation omitted).

Under the favorable summary judgment standard, Kwentoh has established the first three elements of her prima facie case for adverse employment action. She belonged to a protected class, she was apparently qualified for the position she held, and she suffered at least one adverse employment action. The only remaining question is whether the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. The parties' accounts of the incidents and behaviors leading to the negative performance appraisals and to Kwentoh's termination differ, and affidavits have been submitted in support of both positions. Kwentoh states in her affidavit that she heard Colonghi refer to Kwentoh's nursing as "primitive." (Kwentoh Affidavit ¶ 16). Kwentoh believes this was an allusion to the stereotype

that Africa in general is "primitive" and is evidence of Colonghi's application of this irrational stereotype to Kwentoh herself, who is from Nigeria. Kwentoh also provided an affidavit from co-worker Regina Moore, in which Ms. Moore states her belief that the Nursing Board report regarding Kwentoh's failure to notify a physician about the youth in heroin withdrawal was an "extreme reaction." (Kwentoh Affidavit, Exhibit 39). Finally, Kwentoh has produced letters from several of the nurses working under her supervision, attesting to her competence as a nurse supervisor. The Court finds that a reasonable jury could credit Kwentoh's description of events, and could conclude that the totality of the circumstances here gives rise to an inference of discriminatory intent.

The defendants claim that they gave Kwentoh negative performance appraisals and terminated her due to her demonstrated lack of job skill and knowledge and her poor judgment. They have documented the performance issues they say were the basis for her termination. Kwentoh has not proven that these legitimate reasons proffered by her employer are pretextual, but the affidavits and statements she offers in support of her claim of discrimination are sufficient to create a genuine issue of material fact on the question of pretext. The Supreme Court held in Reeves v. Sanderson Plumbing Prods., Inc. that "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." 530 U.S. 133, 143 (2000) (internal citations omitted). Therefore a grant of summary judgment in favor of the defendants as to the adverse employment action claim would be inappropriate.

2.      Hostile Work Environment Claim

Kwentoh's second Title VII claim requires demonstration that she suffered harassment that amounted to a hostile work environment on the basis of her race, color, religion, sex, or national origin.  Feingold, 366 F.3d at 149.

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted); see Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).  In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances. See Harris, 510 U.S. at 23.  A non-exclusive list of factors that courts consider in making such a determination includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." Alfano v. Costello, 294 F.3d 365, 379 (2d Cir.2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive."  Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir.1989); Tomka, 66 F.3d at 1305 n. 5 (citations omitted) ("[T]he incidents must occur in concert or with a regularity that can reasonably be termed pervasive."); Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive.  Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).  Title VII is not "a general civility code," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

Although actionable harassment is not confined to explicitly racial conduct, "the plaintiff is required to establish that the harassment complained of was based on her [race]." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998) (citations omitted).  Title VII does not protect employees from hostile conduct that is not based on their protected status.  In Alfano v. Costello, the Second Circuit stated:

> It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals. . . .
> Facially neutral incidents may be included, of course, among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on race.  But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.

294 F.3d 365, 377 (2d Cir. 2002).

Considering the totality of Kwentoh's work environment, and resolving all disputed issues of fact in favor of Kwentoh, the Court finds that although genuine issues of fact exist as to both the severity and pervasiveness of the alleged harassment she faced and as to whether the

harassment was motivated by Kwentoh's race, color, or national origin, she has met the "minimal" burden of establishing a prima facie case. Kwentoh's affidavit contains her account of the lack of merit behind Colonghi's various disciplinary actions and the alleged Colonghi comment regarding Kwentoh's "primitive" nursing practices, as discussed above. Kwentoh has also claimed that other Caucasian employees were not subjected to the same level of scrutiny that she was, and lists several examples of such scrutiny that she claims illustrate that Colonghi wanted to find a way to terminate Kwentoh. A jury must determine the weight and significance it attaches to all the evidence that is presented at trial. As in the adverse employment action claim, Kwentoh has created a question of fact as to whether the legitimate, nondiscriminatory reasons offered by the defendants are pretextual, and this cause of action therefore survives the defendants' request for summary judgment.

### 3. Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Raniola v. Bratton; 243 F.3d 610, 624 (2d Cir. 2001).

In the context of a retaliation action an adverse employment action must be "materially adverse," in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006). While "the anti-retaliation provision [of Title VII]. . . is not limited to discriminatory actions that affect the terms and conditions of employment," Id. at 2412-13, "[a]n

15

employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 2415.

As with disparate treatment, once a plaintiff has satisfied his or her prima facie burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. See Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back to the plaintiff "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

Kwentoh filed her CHRO complaint[5] on January 22, 2003 and alleges that the harassment she suffered worsened in retaliation for that complaint. The defendants received notice of the complaint from CHRO on February 7, 2003. Colonghi issued an unsatisfactory performance appraisal for Kwentoh in September 2003. Because this was Kwentoh's second unsatisfactory evaluation, she was dismissed in October 2003. However, Kwentoh bears the burden of showing a causal connection between the filing of her CHRO complaint and a negative employment action, for example the second negative performance appraisal or her subsequent termination. Both of these actions occurred at least ten months after the CHRO complaint, and therefore the temporal proximity of either action will not be sufficient to establish causation. See Clark County School District v. Breeden, 532 U.S. 268, 273 (2001). Moreover, the negative

---

[5]Kwentoh also calls the Nursing Board complaint filed by her employer after the incident involving the heroin-addicted youth (but before she filed her CHRO complaint) "retaliatory." This characterization fails because the Nursing Board complaint did not follow Kwentoh's participation in any activity protected by Title VII against retaliation.

performance appraisal contains detailed comments regarding the basis for the appraisal, including her poor judgment relating to the admission of a heroin-addicted youth which occurred in January 2003, before Kwentoh filed her CHRO complaint. Therefore, the second appraisal adequately alleges a legitimate reason for the negative performance rating.

However, it is Kwentoh's allegation that the harassment she suffered worsened after she filed the CHRO complaint, and a comparison of the three performance appraisals she received (in November 2000, September 2002, and September 2003) could, in the eyes of a reasonable jury, support this allegation. A reasonable jury could also conclude from the performance appraisals and other surrounding circumstances that the detailed description of Kwentoh's unsatisfactory performance contained in the 2003 appraisal was pretextual. For example, the "Quantity of Work" job element was rated as "good - turns out large volume" in 2000, with a comment that Kwentoh "role models work load expectations for her nursing staff." Her "Knowledge of work" was rated "Good - Adequate grasp of essentials. Some assistance" in 2000. In 2002, her quantity of work was rated "Average" and comments noted an attendance problem based on her taking sick leave during the year, and noted the need for "constant managerial intervention and direction with supervisory duties." Kwentoh's knowledge of work in 2002 was rated as "Less than good - requires considerable assistance" with the comment that "Considerable direct supervision has been necessary. Frequently has stated this past year she has not understood her job responsibilities as a supervisor." The 2003 "Quantity of work" job element received the same rating as in 2002, but the comment was so lengthy as to require a separate page which stated "[a]dditional deficits identified in basic nursing practice during this rating period" and listed as support complaints relating to her scheduling practices "for over 4 years." Two other specific

instances of alleged deficits in her knowledge are listed, at least one of which Kwentoh disputes.

Kwentoh has created genuine issues of material fact as to whether as a result of the CHRO complaint Colonghi increasingly scrutinized Kwentoh's performance, increasingly undermined Kwentoh's supervisory authority, or in other ways escalated the creation of a hostile work environment. She has also created an issue of fact as to whether an escalation of hostilities resulting from the CHRO complaint led to and culminated with the second negative appraisal (and Kwentoh's resulting termination). Kwentoh's claim of retaliation is not based on a claim of temporal proximity between the protected action and the negative performance appraisal, but rather describes a campaign of hostility and sabotage that she says worsened after she filed the CHRO complaint. Summary judgment on this claim is therefore inappropriate and a trier of fact must be given the opportunity to decide whose characterization of the relevant facts is supported by the most credible evidence.

**B.   Equal Protection and First Amendment Retaliation Claims**

In Count Three, Kwentoh alleges that she was deprived of equal protection of the law in retaliation for her exercise of First Amendment rights and on the basis of her race, color, and national origin. This Count is brought pursuant to 42 U.S.C. § 1983 and is against Colonghi only.

1.   Equal Protection

A § 1983 claim, if based on substantive rights distinct from and predating Title VII, is not precluded by a concurrent Title VII claim. Ericson v. City of Meriden, 113 F.Supp.2d 276, 289 (D. Conn. 2000) (internal citations omitted). Accordingly, claims of intentional discrimination remain actionable under § 1983 as violations of the Equal Protection Clause and stand

independently of Title VII.  <u>Moche v. City University of New York</u>, 781 F. Supp. 160, 169

(E.D.N.Y.1992), <u>aff'd</u> without opinion, 999 F.2d 538 (2d Cir. 1993).  However, the Second

Circuit has adopted the rule that "although Title VII supplements and overlaps § 1983, it remains

an exclusive remedy when a state or local employer violates *only* Title VII."  <u>Moche</u>, 781 F.

Supp. at 168 (emphasis added).  For example, an employer's policies or actions might violate

Title VII's "adverse impact" rule without raising a constitutional violation.  Stephen Shapiro,

<u>Section 1983 Claims to Redress Discrimination in Public Employment: Are They Preempted by</u>

<u>Title VII?</u>, 35 Am. U. L. Rev. 93, 115 (1985); <u>see also, e.g.,</u> <u>Washington v. Davis</u>, 426 U.S. 229,

245 (1976) (racially neutral employment test for police officers not unconstitutional even though

greater proportion of blacks fail); Douglas Miller, <u>Off Duty, Off the Wall, But Not Off the Hook:</u>

<u>Section 1983 Liability for the Private Misconduct of Public Officials</u>, 30 Akron L. Rev. 325, 388

(1997) ("The intentional discrimination requirement has traditionally been viewed as a hurdle

significantly more difficult to clear than any mental state requirement imposed by Title VII.").  A

disparate treatment (intentional discrimination) claim exists under the equal protection clause as

well as under Title VII and therefore the two claims can be brought concurrently; the elements

for the two claims are the same.  <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 143 (2d Cir. 2006).

Accordingly, summary judgment on the equal protection claim is inappropriate, as described

above.

      In contrast, a § 1983 retaliation claim is not actionable under the equal protection clause

because allowing such a complaint would allow the complainant to bypass the administrative

process that plays a crucial role in the scheme established by Congress in Title VII.  <u>Id.</u>; <u>see also</u>

<u>Lewis v. State of Delaware Dep't. of Public Instruction</u>, 986 F. Supp. 848, 857 (D. Del. 1997).

Such a complaint is more properly remedied through Title VII.  Id.  Therefore summary judgment is appropriate as to the retaliation claim.

### 2.    First Amendment Retaliation

Kwentoh's counsel indicated at oral argument on November 7, 2008 that she is not pursuing the First Amendment claims.  Accordingly, summary judgment is granted as to this claim.

### 3.    "Class of One" Claim

The Supreme Court formally recognized class-of-one equal protection actions in Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam). In Olech, a municipality conditioned water service for a property on the plaintiff-owner's granting a 33-foot easement, even though it required only a 15-foot easement from every other property owner. Id. at 563.  The Court allowed the plaintiff to proceed on the class-of-one theory, recognizing claims where a "plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564.  The Court stated that allegations of irrational and wholly arbitrary treatment, even without allegations of improper subjective motive, were sufficient to state a claim for relief under equal protection analysis. Id. at 565.  However, a "class of one" claim may not be brought against a public employer.  Engquist v. Oregon Dept. of Agriculture, ___ U.S. ___, 128 S.Ct. 2146 (June 9, 2008).

CJTS, Kwentoh's employer, is a state agency.  Therefore, under Engquist, she may not bring an equal protection "class of one" complaint against CJTS or its employees.  To the extent that the "class of one" equal protection complaint is brought against Colonghi as a private individual, it fails because it is well established that the government has no duty under the Equal

Protection Claus to protect individuals from privately inflicted harms. Summary judgment is therefore granted as to the "class of one" equal protection claim.

IV.  **Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment [Dkt. # 38] is GRANTED in part and DENIED in part.

[The motion is DENIED as to the Title VII claims against the defendants in Count One; GRANTED as to the "class of one" claim and the First Amendment retaliation claim in Count Three; and DENIED as to the remaining Equal Protection claims in Count Three.]

**SO ORDERED** this 2nd day of December 2008 at Hartford, Connecticut.

  /s/ Christopher F. Droney
CHRISTOPHER F. DRONEY
United States District Judge